## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

DAMON DENSON,

     *Plaintiff*,

*v.*                          CASE NO. 2:13–CV–14338–RHC–PTM

COMMISSIONER OF           DISTRICT JUDGE ROBERT H. CLELAND
SOCIAL SECURITY,          MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

     In light of the entire record, I suggest that the Commissioner failed to apply the proper legal standard in determining that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment be **DENIED**, that the findings of the Commissioner be **REVERSED**, and the case be **REMANDED** for an award of benefits.

### II.    REPORT

#### A.    Introduction and Procedural History

     This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), to review the Commissioner's decision denying Plaintiff's claim for

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 16.)

Plaintiff Damon Denson was thirty-one years old at the most recent administrative hearing. (Transcript, Doc. 13 at 32, 130.) Plaintiff worked as a chore provider for five years and as a cook/waiter for thirteen years. (Tr. at 170.) Plaintiff filed Title II and Title XVI disability claims on June 7, 2010, alleging that he became unable to work on May 15, 2008. (Tr. at 12, 130.) The claims were denied at the initial administrative stages. (Tr. at 64-55.) In denying Plaintiff's claims, the Commissioner considered asymptomatic HIV infection. (*Id*.) On March 20, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Donald G. D'Amato, who considered the application for benefits *de novo*. (Tr. at 9-31, 32-53.) The ALJ found Plaintiff was not disabled on April 13, 2012. (Tr. at 28.)

Plaintiff requested a review of this decision, and on August 16, 2013, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, after review of additional exhibits,[2] (Tr. at 196-200, 459-99), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-5.) On October 14, 2013, Plaintiff filed this suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1 at 1.)

**B.     Standard of Review**

Through the Social Security Act and its subsequent amendments, Congress created a statutory right for those who demonstrate that they are disabled to collect disability benefits. 42

---

[2] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the Court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

U.S.C. §§ 301-1397. With the Act Congress also established the Social Security Administration ("SSA") and gave it (1) adjudicative power "to administer the old-age, survivors, and disability insurance[,] . . . and the supplemental security income program[s]" under 42 U.S.C. § 901, and (2) rulemaking power, subject to rulemaking procedures, for the Commissioner to "prescribe . . . rules and regulations" when they are determined to be "necessary or appropriate to carry out the functions of the Administration" under 42 U.S.C. § 902. Therefore, the Social Security Administration ("the Agency") makes factual determinations about whether a person qualifies for disability benefits and also establishes regulations to guide the administration of benefits.

The Agency has promulgated the following rules[3] for the administration of its disability insurance benefits. 20 C.F.R. 401-422. First, a state agency, "acting under the authority and supervision of the Agency," usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503;  *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If a claimant is denied, he or she may seek review of the state's decision with the Agency's three-stage review process. *Yuckert*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after exhausting the Agency's administrative remedies, that is, after the Commissioner has issued a final administrative decision that is unfavorable, may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc). This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C.

---

[3] The federal judiciary's review of the Agency's promulgated regulations is limited to ensuring the rules do not exceed the authority given to the Agency by Congress and that they are not arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105.

§ 405(g). Our review is limited because we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely

because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record before the ALJ only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C.   Governing Law

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the

claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work . . . ." *Jones,* 336 F.3d at 474, *cited with approval in Cruse,* 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through June 30, 2012, and had not engaged in substantial gainful activity since May 15, 2008, the alleged onset date. (Tr. at 14.) At step two, the ALJ found that Plaintiff's HIV, hepatitis B, history of hemorrhoids, irritable bowel syndrome,

history of recurrent diarrhea, history of anemia, status post gunshot wound to the back (left scapula) with fractured ribs, major depressive disorder, antisocial personality disorder, posttraumatic stress disorder, insomnia, history of marijuana abuse, history of syncope–most likely orthostatic, history of molluscum contagiosum, leucopenia, transminitis, pneumonia and bandemia, and spondylitis of the lumbar spine were "severe" within the meaning of 20 C.F.R. § 404.1520. (Tr. at 14-15.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listings in the regulations. (Tr. at 15-17.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 26.) The ALJ also found that at the alleged onset Plaintiff fell into the "younger individual" age range of eighteen to forty-nine because he was twenty-seven years old at the alleged onset date. (*Id.*) At step five, the ALJ found that Plaintiff could perform light, unskilled work. (Tr. at 17,26.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 27.)

### E.    Administrative Record

### 1.    Medical History

On March 18, 2008 a carjacker shot Plaintiff in the back, resulting in a surgery to remove the bullet, a broken scapula, two fractured ribs, a collapsed left lung, and a two week stay at Sinai-Grace Hospital. (Tr. at 210-11, 284, 292, 428-58.) He was hospitalized at Sinai-Grace Hospital from March 18 to March 27, 2008. (Tr. at 428-58.) His discharge diagnosis was gunshot wound to chest with left hemothorax, fourth and sixth rib fracture, and decreased attenuation in the white matter of his brain. (*Id.*)

On September 28, 2009 Plaintiff was diagnosed with HIV. (Tr. at 240.) The diagnosis was confirmed on January 19, 2010 when Plaintiff's HIV RNA viral load was measured at 27300. (Tr.

at 223.) On January 15, 2010 Plaintiff began HIV treatment with Dr. Wasif Hafeez in the infectious disease department of Sinai-Grace Primary Care Clinic; the treatment was managed by Certified Nurse Practitioner D'Amour. (Tr. at 210, 240.) Plaintiff also tested positive for and was diagnosed by Dr. Hafeez with Hepatitis B. (Tr. at 222-23.) On February 18, 2010, Dr. Hafeez also diagnosed Plaintiff with penile lesions and Kaposi's sarcoma, without visceral involvement. (Tr. at 222.) Dr. Hafeez also tested Plaintiff's blood on February 18 and found his HIV nonreactive. (Tr. at 237.)

On February 18, Nurse D'Amour noted that Plaintiff would begin HAART therapy, that he had penile lesions or possibly warts, referred him to a dermatologist, discussed marijuana and tobacco cessation, and told him to follow up with a colorectal surgeon regarding his hemorrhoids. (Tr. at 219.) Plaintiff had problems with hemorrhoids, problems with an anal fissure, hesitancy with voiding, no constipation, and reported that a few months ago he had pink blood in his stool. (Tr. at 214.) He was positive for depression, was on Zoloft for anxiety attacks, and had been seeing a therapist named Melissa; his gait was steady, upright, balanced and his affect was appropriate. (Tr. at 217-19.)

On March 19, 2010 Plaintiff saw Nurse D'Amour for a follow-up exam. (Tr. at 206-08.) Nurse D'Amour documented his HIV RNA viral load as 444,000 on February 18 and 273,000 on January 19. (*Id.*) Plaintiff did not have any complaints at this visit; he reported that the symptoms of abdominal pain and diarrhea that he experienced after starting HAART had subsided. (*Id.*) Nurse D'Amour noted that hemorrhoids were still present and he had not followed up with the colorectal surgeon. (*Id.*)

9

On April 14, 2010 Plaintiff went to Sinai-Grace Hospital Primary Care Center and saw Dr. Raylene Platel for a physical examination, a lipid profile, and with complaints of a rash around his neck and on his penis. (Tr. at 240-42.) Plaintiff stated that he had not "seen a primary care physician for multiple years." (*Id.*) Plaintiff said he had been on HAART therapy for about a month. (*Id.*) He reported trouble sleeping and he denied headaches, nausea, vomiting, visual changes, neck pain, chest pain, difficulty breathing, abdominal pain, distension, diarrhea, constipation, fatigue, or anxiety. (*Id.*) Plaintiff's vital signs, general appearance, HEENT, neck, CVS, respiratory, abdomen, extremities, and neurologic examinations were normal; his skin was positive for "[m]acular lesions on the neck and on the penis." (*Id.*) Dr. Platel's impression was HIV viral load 276,000 and molluscum contagiosum ("MCV"). (*Id.*) Dr. Platel stated that the MCV should resolve with HAART therapy and counseled Plaintiff on informing partners of disease, safe sexual practices, and strict contraception and condom use. (*Id.*)

On September 24, 2010 Plaintiff returned to Sinai-Grace Hospital's Infectious Disease department for a follow up on his HIV treatment. (Tr. at 337-42.) His HIV RNA for September 3 measured less than forty-eight and for June 9 it was seventy. (*Id.*) He continued to practice 100% compliance to his HIV treatment. (*Id.*) At this visit, he complained about having lower back pain for the last month that was making it difficult for him to stand straight up and was causing tingling in his right leg. (*Id.*) He stated that the back pain first presented after his gunshot wound and that he was using marijuana to help his back pain. (*Id.*) Plaintiff's HIV was asymptomatic and stable, he had atopic dermatitis–eczema, and he was referred to a pain specialist for his back pain. (*Id.*) On September 24 Plaintiff also received a lumbar spine complete with obliques exam; Dr. Hafeez's

impression from this exam was "[u]nfused posterior elements at S1 but no subluxation of the vertebral bodies or pars fracture. (Tr. at 365.)

On October 5, 2010 Plaintiff saw Dr. Ernesto Bedia, M.D. for an examination regarding his alleged disability from the gunshot wound and HIV. (Tr. at 284-86.) At this visit, Plaintiff told Dr. Bedia that his back still hurt from the gunshot wound and he could not lift anything heavier than fifteen pounds. (*Id.*) Plaintiff reported that he occasionally smokes marijuana and he denied abdominal pain and diarrhea. (*Id.*) Upon examination, his abdomen showed normoactive bowel sounds and was tympanitic; his liver, spleen, and kidneys were not enlarged; and there was no tenderness or masses. (*Id.*) Dr. Bedia's impression was status post gunshot wound to the left chest and HIV positive. (*Id.*) Dr. Bedia also noted that Plaintiff had full range of movement in his shoulder and his last viral load was undetectable. (*Id.*)

On October 1, 2010 Plaintiff saw Dr. Gregory Berger, MD at the Sinai-Grace Hospital Primary Care Center for a checkup, with complaints of rhinorrhea that had been a problem for about a week, and with complaints of itchy skin. (Tr. at 422-24.) He was following up from an April 2010 visit regarding his molluscum contagiosum rash. (*Id.*) He reported the following symptoms: trouble sleeping, occasional back pain, no headache, no nausea, no vomiting, no abdominal pain, no diarrhea, no constipation, and no fatigue. (*Id.*) Upon examination, his vital signs, general appearance, HEENT, neck, CVS, Respiratory, Abdoment, extremities, neurological, and skin were all normal. (*Id.*) Specifically, his abdomen showed no organomegaly, was nontender and nondistended, and bowel sounds were positive. (*Id.*) Dr. Berger's impression was HIV and eczema. (*Id.*) Dr. Berger noted in his treatment plan that the "[m]olluscum contagiosum has resolved." (*Id.*)

11

On October 15, 2010 Plaintiff was admitted to Botsford General Hospital with a diagnosis of generalized abdominal pain and diarrhea. (Tr. at 247.) His attending doctor during this stay was Dr. Bruce Cassidy. (Tr. at 275-76.) Plaintiff was dehydrated and nauseous but there was no blood or mucous in his stool; his diarrhea was watery and yellow and it had kept him up all night. (*Id.*) He was treated with saline intravenously at 125 ml per hour, (Tr. at 261), and was discharged on October 22, 2010. (Tr. at 264.)

While at the hospital, Plaintiff told a consulting doctor, Dr. Michael Rebock, D.O., that he had a similar incident with his diarrhea about a year ago. (Tr. at 275.) He also told Dr. Rebock that he smoked marijuana occasionally. (*Id.*) His abdomen was soft, nontender, and nondistended; there were positive bowel sounds, there was no rebound, rigidity or guarding, and there was no tenderness to percussion. (*Id.*)

Plaintiff also was seen by consulting doctor Mariquit Sendelbach, D.O. (Tr. at 280-82.) Plaintiff was positive for chronic back pain. (*Id.*) He reported that before he was admitted he was having a bowel movement every five minutes. (*Id.*) He also stated that even though he was on Imodium while at the hospital he was still having "multiple bowel movements with loose watery stools." (*Id.*) There was no blood in the stool. (*Id.*) Dr. Sendelbach noted that his CD4 was 424 and he had an undetectable viral load. (*Id.*) Dr. Sendelbach's impression was "intractable acute diarrhea, secondary to shigellosis"; chronic hepatitis B; a history of HIV; leukopenia, chronic secondary to HIV; anemia; a history of transaminitis secondary to HIV; and "[b]andemia secondary to infection versus inflammatory process." (*Id.*)

During this hospitalization, an ultrasound of Plaintiff's abdomen showed his liver, spleen, and pancreas as "unremarkable," except for "increased echogenic foci within the spleen suggesting

old granulomatous change"; his gallbladder was normal; and his aorta, and inferior vena cava were unremarkable. (Tr. at 258.) The impression from the ultrasound was "enlarged kidneys with complete loss of the normal corticomedullary differentiation," that the "imaging characteristics [were] nonspecific," that the possibility of an "infiltrative disorder without" was "to be considered" because an infectious etiology might have a similar appearance, and that "if renal function is normal [a] CT without and with contrast may be of benefit in future evaluation." (Tr. at 259.)

On his December 16, 2010 follow up with the Infectious Disease department, Plaintiff complained of diarrhea incidents about twice a week that would present with rectal pain and pressure–he stated that it had been a problem for about a year and that there was a little bit of blood in the stool. (Tr. at 330-36.) At this visit he also complained that he was still having back pain and was told to follow up with his primary care physician. (*Id.*) Plaintiff was advised that he could take Imodium if his diarrhea symptoms persisted and was referred to a gastrointestinal clinic. (*Id.*) At this visit, Plaintiff's HIV virus load was undetectable. (*Id.*)

On his March 3, 2011 follow-up to the Infections Diseases department, Plaintiff failed to follow up with his referral for a colonoscopy; his HIV virus load was undetectable. (Tr. at 329-31.) His HIV RNA was less than 48 on Feb. 16. (*Id.*) On his May 31, 2011 visit he again complained of his back pain; his HIV was stable and his virus load was 654. (Tr. at 326-28.) On February 2, 2012 Plaintiff failed to show up for his appointment. (Tr. at 322-325.) He was called at home and complained about depression and back pain–he was told to follow up with the pain clinic. (*Id.*)

On April 29, 2011 Plaintiff saw Dr. Manual Sklar at Sinai-Grace Hospital Primary Care Center. (Tr. at 419-22.) Plaintiff went to see a doctor because two days ago when he stood up after watching television he felt dizzy and fell down. (*Id.*) Plaintiff said that this sort of episode had

happened to him at least once before. (*Id.*) He also complained about his back pain and requested pain medicine to treat it because Motrin and Tylenol were not working. (*Id.*) He also complained about depression and wanted to try antidepressants again. (*Id.*) At this visit, Plaintiff denied diarrhea and belly pain. (*Id.*) Upon examination, Plaintiff's vital signs, general appearance, HEENT, neck, lungs, cardiac, abdomen, and extremities were all normal except he had mild congestion in his throat. (*Id.*) Dr. Sklar's impression was that Plaintiff's fall was questionable syncope and it was most likely orthostatic, that Plaintiff had depression and should begin Zoloft, that his molluscum contagiosum should be treated with hydroxyzine, and that Plaintiff abused tobacco and marijuana. (*Id.*)

On September 14, 2011 Plaintiff went to Sinai-Grace Hospital Primary Care Center and saw Dr. Platel again. (Tr. at 416-18.) He went to the clinic because his back hurt–he asked specifically for Vicodin because he did not feel that Tylenol was helping. (*Id.*) Upon further questioning, he admitted to having frequent bowel movements for the last six months–he would have abdominal pain that would be relieved with his bowel movement. (*Id.*) He also would sometimes notice blood on the toilet paper and in the stool. (*Id.*) He also would sometimes have pain and pressure in his rectum and sitz baths did not help reduce symptoms. (*Id.*) Upon examination, Plaintiff's vital signs, general appearance, HEENT, neck, chest, skin, lungs, cardiovascular, abdomen, and neurologic were all normal. (*Id.*) Dr. Platel also noted that the molluscum contagiosum had cleared and there were no new skin rashes; the impression was diarrhea with blood and Plaintiff was referred to a gastroenterologist; his syncopal episodes were most likely orthostatic and he was currently stable; his molluscum contagiosum was resolved; and he was continued on Zoloft for depression.  (*Id.*)

14

On January 18, 2012 Plaintiff returned to Dr. Platel with complaints of diarrhea problems over the last seven to eight months and for his lower back pain. (Tr. at 413-15.) He reported that he has to go to the bathroom more than five times a day and there was sometimes blood in the stool.  (*Id.*) He stated that he was unable to follow up with the gastroenterologist because of transportation issues. (*Id.*)  He was given a trial of Flagyl for his diarrhea and was again referred to a gastroenterologist. (*Id.*) Regarding his back pain, he specifically asked for Vicodin because he had recently fallen off a ladder and the new pain combined with the gunshot wound pain caused him a lot of suffering. (*Id.*) Dr. Platel explained that policy precluded a Vicodin prescription and he replied that any other pain medicine would help.  (*Id.*) He was given Tylenol 3 because his insurance did not allow for a pain clinic referral. (*Id.*) Dr. Platel's examination of Plaintiff was again normal. (*Id.*)

On November 10, 2010 Plaintiff saw Dr. Nick Boneff, a licensed psychologist, regarding his disability claim. (Tr. at 292-96.) At this visit Plaintiff explained that his back problems began a few months after the gunshot wound, that he could not lift more than fifteen pounds, that his lower back gave out sometimes, that his right leg sometimes became numb after walking, and that he sometimes uses a cane. (*Id.*) Plaintiff reported that he had been depressed since the gunshot wound, he "presented as being in adequate overt contact with reality, with no evidence of an overt thought disorder," and he reported a history of suicide attempts and the general feeling that others were against him. (*Id.*) Dr. Boneff diagnosed Plaintiff with "[m]ajor depression, recurrent, moderate, without psychotic features," assessed his GAF score as 50, and noted that Plaintiff "appear[ed] capable of engaging in work-type activities of a moderate degree of complexity,

remembering and executing a several step procedure on a sustained basis, with little in the way of independent judgment or decision-making required." (*Id.*)

Plaintiff was treated by psychiatrist Dr. Timothy Chapman, M.D., at Team Mental Health Services from October 4, 2011 to January 13, 2012. (Tr. at 298-321.) He participated in group and individual sessions. (*Id.*) His presenting complaints included "rapid mood swings, irritability, agitation, sadness, loss of interest, insomnia, flashbacks, hyperv[i]gilance and avoiding people." (*Id.*) At intake, he reported that he had attempted suicide twice after his HIV diagnosis, that he had nightmares and flashbacks, that he avoided restaurants since being shot at a Burger King, and that he had crying spells. (*Id.*) His social history included a history of marijuana abuse that had not reached the level of dependence. (*Id.*) He "demonstrated good grooming, timeliness, orientation times four, euthymic mood, calm behavior with social smile, logical and coherent thought process, intact judgment, normal speech, [and] good eye contact." (*Id.*) There was no delusional, obsessive, or compulsive thought, or psychosis evident. (*Id.*) Plaintiff did not appear to have any current suicidal or homicidal thoughts, plans, or intent. (*Id.*) Dr. Chapman diagnosed him with PTSD, major depressive disorder, and a GAF score of fifty-two. (*Id.*)

### 2.    Plaintiff's Function Report and Testimony at Administrative Hearing

Plaintiff indicated in his Function Report that he was unable to lift more than ten pounds with his left arm because of pain from the gunshot wound. (Tr. at 174-181.) He also stated that he was in constant body pain because of his HIV. His daily activities included caring for his autistic brother and resting his body to deal with pain. (*Id.*) His pain only allowed him to get about three hours of sleep a night; he had no problems with his personal care; he cooked his own meals; he washed his own dishes and did his own laundry; he avoided yard work because of pain and

inability to lift heavy objects; he went outside about five times a week; and he was able to go shopping on his own. (*Id.*) His hobbies included watching television, cooking, and playing cards; and he did not report problems getting along with others. (*Id.*) He said he has a difficult time lifting, bending, standing, reaching, sitting, kneeling, and stair climbing. (*Id.*) He also indicated that he could only walk thirty to forty feet before he needed to take about a ten minute break; he used a back brace every day but it was not prescribed; and the medicine he was on gave him diarrhea and stomachaches. (*Id.*)

At the administrative hearing, Plaintiff testified that his diarrhea started in January of 2010 after beginning his HIV medicine and that he still has problems with it; that the only treatment he has for his diarrhea is Imodium, which does not work very well; that he had five to six bowel movements a day, four to five times per week; and that the insomnia was related to PTSD from the gunshot wound. (Tr. at 38-40.) He testified that he could only sit or stand for about fifteen minutes because of the pain he would get in his lower back if he did not move, that he could only walk about a block to a block and a half without resting; that he would only be able to frequently lift between eight and twelve pounds on his left side; that on his right side he could lift about twenty to twenty-five pounds; that he could probably only climb stairs about three times in a day; that he would be able to bend over to pick up something dropped about sixty percent of the time; that his left arm and hand sometimes "closes up"; that his typical pain level in the morning was about a nine to ten out of ten every morning; that he takes Tylenol 3 for pain, which drops it down to about a six; and that he occasionally smokes marijuana for his back pain. (Tr. at 38-46.) He attributed his depression and PTSD to the gunshot wound and the severe depression to the HIV diagnosis. (*Id.*) He asserted that he avoided people and places and that he was afraid of going to fast food

restaurants because of the shooting. (*Id.*) He also said that he had nightmares and flashbacks almost every other day; that he had mood swings; that he just stayed at home; and that he still had crying spells. (*Id.*)

### 3. Vocational Expert Testimony at Administrative Hearing

At the administrative hearing, the ALJ asked Lois Brooks, the vocational expert ("VE"), to consider a hypothetical individual with the same age, education, and work experience as Plaintiff who had the following limitations:

> requires work which is simple, unskilled, with 1-, 2-, or 3- step instructions; occasionally in close proximity to coworkers and supervisors, meaning the individual can occasionally function as a member of a team; occasionally in direct contact with the public; and a low-stress environment, defined as having only occasional changes in the work setting. Such an individual can lift or carry 10 pounds frequently and 20 pounds occasionally . . . using primarily the right upper extremity with guidance assistance with the left upper extremity. Such an individual can stand and/or walk with normal breaks for a total of six hours in an eight-hour work day, but could do so for only 15 minutes at one time. Such an individual can sit with normal breaks for a total of six hours in an eight-hour workday, but could do so for only 15 minutes at one time. In addition to restroom access during regularly scheduled lunch hour and breaks during the workday, the individual would be able to use the restroom additionally two times for five minutes or less during the workday. Such an individual can perform pushing and pulling motions with the right upper and right lower extremities within the aforementioned weight restrictions, but can occasionally do so with the left upper . . . and left lower extremities; can perform prime bilateral manual dexterity for both gross and fine manipulation of handling and reaching for up to 2/3 of a workday; needs to avoid hazards in the workplace such as moving machinery, unprotected heights; needs to be restricted to a work environment with stable temperature, heavy humidity, and good ventilation; can perform each of the following postural activities occasionally: climbing stairs with handrails, balance and stooping, crouching, kneeling, crawling, but needs to avoid climbing ladders, scaffolds, and ropes.

(Tr. at 49-51.) The VE responded that the hypothetical individual could not perform Plaintiff's past work. (*Id.*) The individual would be able to perform any of the following unskilled, light exertional, entry-level occupations available in Southeast Michigan: 3500 assembly jobs, 1800

visual inspection jobs, or 2500 packaging jobs. (*Id.*) These estimates doubled when the geographic range was broadened to all of Michigan. (*Id.*)

The ALJ asked whether there would be any jobs available to the above hypothetical individual if an additional limitation were added so that the "individual requires work which, in addition to any regularly scheduled breaks, allows such individual to be off-task at least one hour per eight-hour day due to the symptomatology from their impairments and/or the ancillary effects of treatment for such impairments." (*Id.*) The VE responded that there would be no jobs available in the second hypothetical. (*Id.*)

The ALJ again asked whether there would be jobs available to the above hypothetical individual if he also needed to miss two work days per month because of "symptomology from their impairments." (*Id.*) The VE responded that there would be no jobs available in the third hypothetical. (*Id.*)  The ALJ confirmed that the VE's testimony was consistent with the Dictionary of Occupational Titles and its companion publication. (*Id.*)

### F.    Analysis and Conclusions

### 1.    Legal Standards

Plaintiff's argument that the "ALJ did not properly evaluate [his] impairments under the third step," (Doc. 15 at 15), is properly reviewed by determining whether the ALJ followed the appropriate legal standard. As indicated above, this Court only reviews an ALJ's decision to ensure that the proper legal standard was followed and that substantial evidence exists in the record to support the decision. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545.

Even when an ALJ's decision is supported by substantial evidence, it will not be upheld "where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right." *Bowen v. Commissioner of Social Sec.*, 478 F.3d 742, 746 (6th Cir. 2007). When the Commissioner meets the regulation's goals, it may be irrelevant that the ALJ failed to follow that regulation's procedure; however, if the ALJ deprives the claimant of a substantial right, one that "is intended to confer a procedural protection on the party invoking it," and not one that is only "adopted for the orderly transaction of business before" the agency, then the ALJ's decision must not be upheld. *Wilson*, 378 F.3d at 547.

### a.   Listings of Impairments and Medical Equivalence

"Under a theory of presumptive disability," step three of the SSA's five step sequential evaluation process requires the ALJ to analyze whether a severe impairment meets or is medically equivalent to one of the listed impairments; if so, the claimant is presumed disabled and the sequential evaluation terminates. *Christephore v. Commissioner of Social Security*, 11-13547, 2012 WL 2274328 at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411, 416 (6th Cir. 2011)); 20 C.F.R. §§ 404.1520. This presumption applies because "[t]he Listing describes impairments that are severe enough to prevent a claimant from doing any gainful activity." *Christephore*, 2012 WL 2274328 at *6. In order to facilitate meaningful review, an ALJ must analyze a claimant's impairments under this step and give a reasoned explanation of the resultant findings. *Reynolds*, 424 Fed. Appx. at 416.

An ALJ that fails to undertake a detailed step three analysis has erred; further, the error is not harmless because the claimant might be presumed disabled with no need of any functional analysis at steps four and five. *Id.* The rule that an ALJ "evaluate the evidence," compare it to the Listing, and "give an explained conclusion" is "prudential and not jurisdictional"–it is impossible to determine whether substantial evidence supports an ALJ's determination without this analysis.

20

*Id.* And because the requirement is prudential a Plaintiff cannot waive this argument by not raising it. *Id.*

An ALJ is not, however, required to consider every Listing or to consider Listings that claimants "clearly do[] not meet." *Sheeks v. Commissioner of Social Security Administration*, 554 Fed. App'x 639, 641 (6th Cir. 2013).

### b. Analysis

HIV is listed as a subcategory of Immune System Disorders in the Listing of Impairments found in 20 C.F.R. Part 404, subpart P, Appendix 1 § 14.08. Section 14.08 has two components that must be met for a claimant's impairments to meet the Listing: (1) "documentation as described in 14.00F," and (2) any one of the enumerated additional components listed as sections 14.08A-J. 20 C.F.R. Part 404, subpart P, Appendix 1 § 14.08.

> Section 14.00F requires proper documentation of an HIV infection.
>
> A definitive diagnosis of HIV infection is documented by one or more of the following laboratory tests: (I) HIV antibody tests. . . . [if ELISA is used confirmation is required by a] more definitive test, such as a Western blot or an immunofluorescence assay. (ii) Positive 'viral load' VL tests. . . . [such as] quantitative plasma HIV RNA, quantitative plasma HIV branched DNA, and reverse transcriptase-polymerase chain reaction (RT-PCR). (iii) HIV DNA detection by polymerase chain reaction (PCR). (iv) A specimen that contains HIV antigen. . . . A positive viral culture for HIV from peripheral blood mononuclear cells (PBMC). (vi) Other tests that are highly specific for detection of HIV and that are consistent with the prevailing state of medical knowledge.

*Id.* § 14.00F. If none of this laboratory evidence is available, the Commissioner may document the HIV infection by the "medical history, clinical and laboratory findings, and diagnosis(es) indicated in the medical evidence." *Id.*

In addition to meeting the documentation of HIV component, a claimant must meet at least one other condition from a list of enumerated conditions. The relevant additional conditions from

14.08A-K are as follows: "(F) [c]onditions of the skin . . . with extensive fungating or ulcerating lesions not responding to treatment" such as, eczema; "(H) HIV wasting syndrome, characterized by involuntary weight loss of 10 percent or more of baseline . . . or other significant involuntary weight loss as described in 14.00F5, and in absence of concurrent illness that could explain" the weight loss with "[c]hronic diarrhea with two or more loose stools daily lasting for 1 month or longer."; (I) "[d]iarrhea, lasting for 1 month or longer, resistant to treatment, and requiring intravenous hydration, intravenous alimentation, or tube feeding"; (K) "Repeated (as defined in 14.0013) manifestations of HIV infection, including those listed in 14.08A-J, but without the requisite findings for those listings . . . and one of the following [limitations] at the marked level": (1) in "activities of daily living," (2) "in maintaining social functioning," or (3) "in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace."*Id.* § 14.08A-K.

Section 12.00 of the Listing of Impairments deals with mental disorders.20 C.F.R. Part 404, subpart P, Appendix 1 § 12.00. Each of the listings except 12.05 and 12.09 has paragraph A components, which require medical substantiation for the underlying disorder, and paragraph B components, which require certain functional limitations; some also have paragraph C limitations, which require further functional limitations. Only 14.08K imposes similar functional limitations on the HIV Listing and it would only be necessary to show these limitations if none of the other conditions from the enumerated list applied.

The ALJ stated that he "considered all appropriate listings in regard to claimant's impairments" and that none of them, either singly or in combination, met the Listings. (Tr. at 15.) The ALJ then went on to evaluate whether claimant's mental impairments met the Listings of 12.04, for affective disorders; 12.06, for anxiety-related disorders; 12.08, for personality disorders;

22

and 12.09 for substance abuse disorders. (*Id.* at 15-17.) The ALJ concluded that "because the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (Tr. at 16.)

The ALJ did not undertake a similar analysis for the HIV listing under section 14.08. (*Id.* at 15-17.) He did not look at the record to determine whether Plaintiff met the two components of the listing. (*Id.*) He did not analyze the medical record from Sinai-Grace's infections disease center that measured Plaintiff's HIV RNA at 27300, (Tr. at 223), nor did he explain how the records apply to the first component of the Listing, which requires documentation of the disease and can be shown by "[p]ositive 'viral load' VL tests . . . [such as] 'quantitative plasma HIV RNA.'" (*Id.*); 20 C.F.R. Part 404, subpart P, Appendix 1 § 14.00F. Nor did he consider any of Plaintiff's subsequent HIV RNA tests that are detailed in the administrative record summary above. (Tr. at 15-17.)

The ALJ also did not evaluate whether evidence of impairments that meet the second necessary component, at least one on the list of enumerated conditions in section 14.08A-K of the HIV Listing, were present in Plaintiff's administrative record. (*Id.*) He did not look at the fact that Plaintiff had been hospitalized at Botsford General Hospital from October 15, 2010 to October 22, 2010 for diarrhea and been placed on intravenous saline. (Tr. at 15-17, 247-261.) Nor did he mention the fact that Plaintiff had been complaining of diarrhea for more than a year and the diarrhea caused him to go to the bathroom five to six times a day at least four to five times a week. (Tr. at 15-17, 38-40, 206-08, 330-36, 413-18.) He did not compare this medical evidence to the 14.08 (I) condition of "[d]iarrhea, lasting for 1 month or longer, resistant to treatment, and

requiring intravenous hydration . . . ." (Tr. at 15-17); 20 C.F.R. Part 404, subpart P, Appendix 1 § 14.08I. In fact there is no mention of the HIV Listing whatsoever. (*Id.*) Furthermore, the ALJ offers no explanation for why this analysis is lacking. (*Id.*)

Plaintiff argues that the ALJ's failure to analyze his HIV impairments under the 14.08 HIV Listing is an error that requires reversal. (Doc. 15 at 16-17.) Defendant argues that (1) there was "no possible way [Plaintiff's] diagnosis of HIV could meet or equal the requirements of any listed impairment," (Doc. 16 at 16), and (2) the ALJ did properly analyze the HIV listing because the "activities of daily living and social functioning" that the ALJ considered in his Listings analysis for mental impairments also apply to 14.08K for HIV infection. (*Id.* at 19-20.) Defendant asks this Court to not reverse the ALJ's decision because in *Sheeks*, 554 Fed. Appx. at 641, the Sixth Circuit said that the ALJ did not have to consider every listing or listings that a claimant's limitations clearly do not meet, and Defendant asserts "there is no possible way [Plaintiff's] diagnosis of HIV could meet or equal the requirements of any listed impairment." (Doc. 16 at 16, 20.)

First of all, the argument that the ALJ did in fact analyze the HIV Listing in the process of analyzing Plaintiff's functional limitations for the section 12.00 Mental Disorder Paragraph B analysis is unpersuasive. *See* (Doc. 16 at 20.) The only way that the 12.00 Listing paragraph B analysis could apply to the HIV Listing would be if Plaintiff was attempting to show the second required component of his HIV Listing in section 14.08K: section 14.08K includes functional limitations as one of its necessary elements. However a claimant can fulfill the second component of the HIV Listing with any one of the eleven conditions laid out in sections 14.08A-K. Therefore a functional limitation would only be relevant if a claimant was attempting to use 14.08K to prove the second required component of the HIV Listing. Because the ALJ never said that he was cross-

24

analyzing HIV 14.08K Listing, and, more importantly because HIV Listing 14.08A-J has no functional limitation requirements, the ALJ's functional limitation analysis could not cross-apply to properly encompass the necessary HIV Listing analysis. Therefore the ALJ failed to analyze Plaintiff's HIV limitations under the 14.08 HIV Listing.

I also suggest that the ALJ's failure to analyze Plaintiff's HIV limitations under the 14.08 HIV Listing was not harmless error. Unlike *Sheeks*, this is not a case where the claimant "clearly" cannot meet a Listing. *See* 554 F. App'x at 641. In *Sheeks*, the ALJ did not analyze the 12.05(C) listing for mental retardation (now called an intellectual impairment). *Id.* The plaintiff argued, after the fact, that the ALJ should have looked at the Listing because, for example, he never finished high school and was in special education classes. *Id.* The Sixth Circuit said that "[a] substantial question about whether a claimant meets a listing requires more than . . . a mere toehold in the record on an essential element of the listing." *Id.* at 642.

In this case there is far more than a toehold in the record on both essential elements of the HIV listings. In fact, I suggest that the record clearly establishes that both of the essential elements of the HIV listing of section 14.08 have been met. The record shows documentation of the disease that meets the Listing's demands for laboratory evidence with Plaintiff's diagnosis of HIV and his viral load HIV RNA testing. (Tr. at 223.) It also shows at least one of the other necessary conditions, section 14.08I, with Plaintiff's hospitalization for his diarrhea that had lasted for over a month, was resistant to treatment, and that required intravenous hydration. (Tr. at 247-61.)

## 2.   Substantial Evidence

Plaintiff also contends that the ALJ's decision is not supported by substantial evidence. (Doc. 15 at 2.)  Because the record clearly makes out both elements of the HIV Listing, because

there is no evidence to the contrary, and because the ALJ failed to provide any analysis, I also suggest that the ALJ's step three HIV Listing finding is not supported by substantial evidence. Since my suggestion that the ALJ did not apply the appropriate legal standard is dispositive, I do not address the issues of whether the ALJ had substantial evidence to support his mental disorder step three finding, or his findings at steps four and five.

### 3.    Remand

Once it has been determined that the Commissioner did not follow the appropriate legal standard, a district court faces a choice. It may either remand the case to the Commissioner for further proceedings or direct the Commissioner to award benefits. The court may reverse and direct an award of benefits if "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits . . . where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Felisky,* 35 F.3d at 1041; *accord, Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). This comports with the principle that "where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Wilson v. Comm'r of Soc. Sec.*, 378 F3d 541, 547 (6th Cir. 2004) (citations omitted).

In this case, for the reasons set forth above, I conclude that there are no unresolved legal or factual issues. Accordingly, I suggest that the ALJ's decision should be reversed and the case remanded for an award of benefits.

### 4.    Conclusion

For the reasons laid out above, I suggest that the ALJ's decision should be reversed and Plaintiff should be awarded benefits**.**

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 15, 2014                /S PATRICIA T. MORRIS
                                      Patricia T. Morris
                                      United States Magistrate Judge


## **CERTIFICATION**

        I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  August 15, 2014                By      s/Jean L. Broucek
                                      Case Manager to Magistrate Judge Morris